Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Sidney I. Schenkier | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 4759 | **DATE** | 6/19/2003 |
| **CASE TITLE** | Nancy Pera vs. Jo Anne Barnhart | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due _____.

(4) ☐ Ruling/Hearing on ____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  ENTER MEMORANDUM OPINION AND ORDER. The Court grants the Commissioner's motion for summary judgment [doc. # 17], and denies Ms. Pera's motion for summary judgment [doc. # 15]. The Clerk of the Court is directed to enter a final judgment pursuant to Rule 58. This case is terminated.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | JUN 2 0 2003 | 19 |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | 6/19/2003 | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| JJK | courtroom deputy's initials | U.S. DISTRICT COURT 03 JUN 19 PM 4: 13 FILED | JJK mailing deputy initials | |

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NANCY PERA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 02 C 4759 |
| | ) | Magistrate Judge Schenkier |
| vs. | ) | |
| | ) | |
| JO ANNE BARNHART, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff, Nancy J. Pera, seeks judicial review of a final decision denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. § 405(g) (R. 7, 14). The parties have filed cross motions for summary judgment; the plaintiff seeks reversal or remand of the Commissioner's decision, and the Commissioner seeks a judgment affirming her decision. Pursuant to 28 U.S.C. § 636(c), and the consent of the parties, the case has been assigned to this Court for all purposes, including the entry of final judgment (doc. ## 11-13). For the reasons set forth below, the Court grants the Commissioner's motion for summary judgment (doc. # 17), and denies Ms. Pera's motion for summary judgment (doc. # 15).

**I.**

On February 29, 2000, Ms. Pera filed an application for DIB, alleging that she had been disabled since September 30, 1998, due to musculoskeletal problems of the left upper extremity (R. 14, 89-91). Ms. Pera's claim was initially denied by the Social Security Administration ("SSA") by a notice dated May 4, 2000, and upon reconsideration by a notice dated May 26, 2000 (R. 14, 70-74, 76-78). After a timely request for a hearing, Ms. Pera appeared with counsel before an ALJ, who

19

heard testimony by Ms. Pera and a vocational expert ("VE") on August 10, 2000 (R. 14, 39-67). The ALJ issued a written decision on August 17, 2000, denying Ms. Pera's claim for DIB (R. 14-21). The SSA Appeals Council, considering new evidence submitted by Ms. Pera's attorney (*i.e.,* a note from a treating physician indicating that Ms. Pera was restricted to lifting less than 5 pounds, no overhead lifting, and no repetitive motion with either arm), denied review of the ALJ's decision, thereby rendering the ALJ's decision the final decision of the Commissioner, subject to judicial review in this Court (R. 7-8). We now consider Ms. Pera's claims for review.

## II.

The following facts are taken from the administrative record, the administrative hearing transcript, and the ALJ's written decision. The Court will discuss the plaintiff's personal and medical history first, followed by a summary of the administrative hearing testimony and the ALJ's written decision.

## A.

Ms. Pera was born on July 2, 1940 and was 60 years old at the time of the ALJ's decision. She was thus a person of "advanced age" under the Act (R. 9, 14, 16). She is a high school graduate, and she has past relevant work experience as a receptionist and a warehouse worker (R. 14, 16, 107, 109, 112). She is right-handed (R. 52).

## B.

In April 1998, while working as a warehouse worker, Ms. Pera injured her left shoulder while reaching to pull an empty case of bottles onto a conveyor belt (R. 17, 193). Ms. Pera visited several doctors as a result of this accident.

Shortly after the accident, in June 1998, Ms. Pera began visiting Dr. Bertolini. At this initial visit, Ms. Pera admitted that she previously had experienced left shoulder pain, but since her injury at work she had experienced a pain in a different location, from the shoulder to the mid-humerus (R. 193). Thus, reaching above her shoulders or behind her back was especially painful (*Id.*). Ms. Pera also admitted that she had previously taken 500 mg. of Relafen for this pre-injury pain, a drug prescribed by a doctor – Dr. Metrou – who had been referred to her by her employer. The Relafen, according to Ms. Pera, had "helped a little" (*Id.*).

Dr. Bertolini's examination revealed that Ms. Pera's left shoulder was tender at the rotator cuff tendon insertion, and that resisted abduction was painful (R. 193). Ms. Pera had full abduction and full rotation, but experienced pain on extremes (*Id.*). In addition, at the 90 degree position, Ms. Pera's left shoulder resisted flexion and resisted abduction were painful but with grade 4 out of 5 strength (*Id.*). Impingement sign was slightly positive, and Dr. Bertolini could palpate a click in the subacromial space (*Id.*). An x-ray taken at this time was negative for fracture. Additionally, the glenoid humeral joint appeared normal and the AC joint had a normal space with now narrowing, although there was a small, inferior spur (*Id.*).

Dr. Bertolini's impression was that there was impingement syndrome secondary to rotator cuff sprain and/or partial tear in her left shoulder (R. 193). Based on this impression, Dr. Bertolini recommended physical therapy to improve her motion and strength, and told Ms. Pera to stay on light duties at work (*Id.*). Dr. Bertolini increased Ms. Pera's Relafen to 750 mg. twice a day, and he told her that a cortisone shot was indicated (*Id.*). Ms. Pera refused the injection, and Dr. Bertolini noted that it could be given later (*Id.*). Dr. Bertolini also noted that Ms. Pera needed an MRI scan to rule

out a tear if her condition did not improve with therapy. A re-examination was ordered for three weeks later (*Id.*).

On July 6, 1998, Ms. Pera again visited Dr. Bertolini (R. 194). At this time, her left shoulder was quite sore, and she did not think that therapy was helping (*Id.*). Dr. Bertolini's examination revealed that Ms. Pera could abduct to 120 degrees (*Id.*). At 90 degrees, resisted abduction was painful but did not give way (*Id.*). Impingement sign was positive and there was a definite click in the shoulder during the test (*Id.*). Additionally, Ms. Pera's internal rotation was limited (*Id.*).

Dr. Bertolini's impression after this examination was that there was probably a partial tear of the rotator cuff tendon in the left shoulder (R. 194). Based on this impression, Dr. Bertolini recommended an injection to the bursa (*Id.*). However, Ms. Pera refused the injection because she is afraid of needles (*Id.*). Dr. Bertolini then suggested that she continue taking Relafen and continuing light duties and physical therapy (*Id.*). Dr. Bertolini also ordered an MRI scan for Ms. Pera and scheduled another visit in two weeks to check her progress and the results of the MRI scan (*Id.*).

On July 20, 1998, Ms. Pera was re-examined by Dr. Bertolini (R. 194). During this visit, Ms. Pera indicated that she was feeling better after doing her therapy and had not even taken Relafen for two weeks (*Id.*). Dr. Bertolini's examination revealed that Ms. Pera has abduction to 130 degrees, flexion to 120 degrees, and resisted abduction with grade four out of five strength without much pain and impingement sign that is only slightly positive (*Id.*). Ms. Pera's MRI scan did not reveal any rotator cuff tear or any other pathology (*Id.*). Dr. Bertolini's impression after this exam was that Ms. Pera most likely sprained her rotator cuff and that the sprained rotator cuff was healing better than he expected (*Id.*). Accordingly, Dr. Bertolini told Ms. Pera to continue therapy for another three

4

weeks to further strengthen her shoulder (*Id.*). A re-examination was ordered for three weeks to check on Ms. Pera's progress, but Dr. Bertolini told Ms. Pera she had a good chance of healing (*Id.*).

On August 10, 1998, Ms. Pera again was examined by Dr. Bertolini (R. 195). At this visit, Ms. Pera reported that since she started taking Relafen, her shoulder was gradually feeling better (*Id.*). She also reported that the physical therapy "really helps" (*Id.*). However, Ms. Pera also reported that her employers were having her do too much at work and that she felt like she was "going around in circles" (*Id.*). Dr. Bertolini's examination revealed a full range of motion in Ms. Pera's left shoulder (*Id.*). Ms. Pera was, however, tender at the rotator cuff insertion (*Id.*). Resisted abduction was grade four out of five, and resisted flexion was grade 4+ out of 5. Impingement sign was slightly positive (*Id.*). Dr. Bertolini's impression was that Ms. Pera was gradually improving with therapy (*Id.*). Accordingly, Dr. Bertolini had Ms. Pera continue therapy and renewed her light duties (*Id.*). He also indicated that he would remind Ms. Pera's employer that Ms. Pera should not do any overhead lifting or reaching and no lifting of 15 pounds in general (*Id.*). Dr. Bertolini told Ms. Pera to continue to take Relafen regularly and to return for a re-examination in two weeks (*Id.*).

On August 26, 1998, Ms. Pera was examined again by Dr. Bertolini and he reported that she was having increased pain in her left shoulder and in the left side of her neck (R. 195). Ms. Pera said that repetitively reaching for bottles at work seemed to be aggravating her condition (*Id.*). Dr. Bertolini told Ms. Pera that he had specifically recommended light duties with no reaching (*Id.*). However, Ms. Pera said she had to follow instructions at her job and that she felt she needed a rest from her work to help her heal (*Id.*). Dr. Bertolini's examination revealed that Ms. Pera's left shoulder was tender at the rotator cuff insertion, and that she had a full range of motion (*Id.*). However, resisted abduction was painful at the shoulder and also over the left side of her neck (*Id.*).

5

Additionally, Ms. Pera was tender and spastic over the left trapezius and paraspinal muscles (*Id.*). Ms. Pera's neck had a full range of motion with pain on extremes of rotation, especially to the left (*Id.*). Dr. Bertolini obtained an x-ray of Ms. Pera's cervical spine (*Id.*). The x-ray showed no disc narrowing. However, it did show reversal of the cervical lordosis consistent with spasm (*Id.*).

Dr. Bertolini's impression was that (1) Ms. Pera's left shoulder was about the same with continued impingement syndrome aggravated by repetitive occupational trauma; and (2) there was cervical tension possibly from the same cause (R. 195). Accordingly, Dr. Bertolini recommended more physical therapy, and started Ms. Pera on 10 mg of Flexeril every six hours as needed for muscle spasm (*Id.*). Dr. Bertolini also continued Ms. Pera on Relafen (*Id.*). Because there were "apparently no light job duties" available to Ms. Pera at her job, Dr. Bertolini took Ms. Pera off work for two weeks to allow her shoulder to rest (*Id.*). He also ordered a re-examination in two weeks to determine if Ms. Pera's condition had improved enough for her to return to work (*Id.*).

During an examination on September 11, 1998, Ms. Pera told Dr. Bertolini that her left shoulder was feeling better as time passed, although it still gave her some pain anteriorly (R. 196). Dr. Bertolini's examination revealed a full range of motion and "just a click with resisted abduction" (*Id.*). Ms. Pera's impingement sign was now negative and her resisted abduction grade was 5 out of 5 (*Id.*). Dr. Bertolini also noted that Ms. Pera's therapist reported grade 5 out of 5 strength on all motions except horizontal adduction, which was grade 4 out of 5.

Dr. Bertolini's impression was that Ms. Pera's left shoulder had improved, but had not completely healed (R. 196). He also told her that he thought she could avoid surgery (*Id.*). Ms. Pera indicated that she felt pressured to return to full duties at work (*Id.*). Dr. Bertolini said he understood the pressure because treatment was costly, but felt that the conservative course of treatment was in

her best interest (*Id.*). Although he noted that Ms. Pera's condition could grow worse with full work duties, because of her good strength he allowed Ms. Pera to return to full duties (*Id.*). Ms. Pera was told to contact Dr. Bertolini within two weeks to report any worsening in her condition, as surgery then might be required to decompress the subacromial area for the impingement (*Id.*). Ms. Pera was told that if her condition remained the same or improved, she should return in four weeks for a check on her long-term progress (*Id.*). Ms. Pera was also told to continue her exercises on her own (*Id.*).

On September 30, 1998, about two weeks later, Ms. Pera returned to Dr. Bertolini (R. 196). At that time, Ms. Pera indicated that she was unable to tolerate the dumping portion of her job (*Id.*). This dumping required a great deal of repetitive rotation of the shoulder and caused a burning pain in Ms. Pera's left shoulder and below, as well as to the medial chest wall (*Id.*). It also occasionally caused a burning down to Ms. Pera's left forearm (*Id.*). Dr. Bertolini's examination revealed that Ms. Pera's left shoulder was still tender over the rotator cuff insertion, although she had a full range of motion at the shoulder (*Id.*). Resisted abduction was grade 4+ out of 5 with burning pain radiating to the anterior proximal humerus, and Ms. Pera was tender over her right trapezius and paraspinal muscles as well as tender over her right trapezius and paraspinal muscles, as well as tender over her AC joint (*Id.*). Impingement sign was completely negative (*Id.*). Ms. Pera experienced pain upon neck rotation to the left (*Id.*). Finally, Ms. Pera's left arm motor and sensory exam were intact (*Id.*).

Dr. Bertolini's impression at this time was that continued left shoulder pain with no sign of impingement ruled out pain from the AC joint (R. 196). Additionally, cervical tension ruled out a bulging disc at C5-6 on the left side (*Id.*). Because it had been almost six months since the initial injury, Dr. Bertolini told Ms. Pera that she needed to consider surgery (*Id.*). He also indicted that the only other alternative was a cortisone injection; however, Ms. Pera refused the injection because

7

she felt it would only offer temporary relief (R. 196-97). Because there was no sign of impingement on the exam, Dr. Bertolini did a block of the AC (R. 197). Ten minutes after the injection, Ms. Pera was completely relieved of shoulder pain, and resisted abduction no longer caused a burning pain down her arm (*Id.*). Dr. Bertolini told Ms. Pera that her pain is more from the AC joint than the subacromial joint space, and that he felt a lot of the pain was from her neck (*Id.*). He then ordered an MRI scan of the neck to rule out bulging at C5-6 (*Id.*). In addition, he told her to resume physical therapy, especially for her neck and AC joint. Because there were no light job duties available, he told her to stay off work (*Id.*).

On October 16, 1998, Ms. Pera returned to Dr. Bertolini and reported that her left shoulder was about the same and that her neck had been sore, mostly on the left side (*Id.*). Dr. Bertolini's examination revealed that Ms. Pera's left shoulder had tenderness over the AC joint (*Id.*). Ms. Pera also had a full range of motion; resisted abduction was grade 5 out of 5; resisted adduction was grade 4 out of 5; and resisted rotation was grade 4 out of 5 (*Id.*). Ms. Pera experienced neck pain on extremes of motion, and the MRI scan of her neck showed mild bulging disc at C5-6 and C6-7 (R. 197, 199) (Ex. 8F). However, the MRI revealed no foramina stenosis nor lateral recess narrowing (R. 197, 199) (Ex. 8F).

Dr. Bertolini's impression was that, although Ms. Pera had continued pain from the AC joint, her left shoulder was about the same and that her rotator cuff was getting stronger. He also diagnosed degenerative disc disease C5-6 and C6-7 with mild bulging discs at those levels (R. 197). Based on these findings, Dr. Bertolini recommended a resection of the distal clavicle (*Id.*). However, Ms. Pera indicated that there were problems with having her new insurance plan cover the surgery (*Id.*). Dr. Bertolini said it was not a new injury; that it should be covered under he old plan; and that

8

she needed to discuss the matter with her employer or seek legal advice (*Id.*). Instead of pursuing the surgery at this time, however, Dr. Bertolini advised Ms. Pera to continue therapy for another two weeks to further strengthen her shoulder (*Id.*). He also indicated that, at the end of the two weeks, especially if there was no improvement, they should make a definitive decision on treatment (R. 198).

On November 16, 1998, Dr. Pietro Tonino ("Dr. Tonino"), an orthopedist, saw Ms. Pera for complaints of a "tearing sensation" in her left shoulder (R. 17) (Ex. 6F). Dr. Tonino reported that the MRI scan that was taken of Ms. Pera's left shoulder was "unremarkable," and the pain injections failed to "abate her symptoms" of pain (although there were no symptoms of numbness or instability) (*Id.*). Dr. Tonino reported that Ms. Pera tried to return to work after her accident, but stopped again due to pain. Dr. Tonino recommended surgery based on x-rays which showed subacromial spur and degenerative changes. Dr. Tonino opined that although the "September 30th injury was clinically insignificant" because the spur probably "predated her injury," that injury aggravated the spur (R. 17).

In December 1998, Dr. Bertolini performed the surgery recommended by Dr. Tonino, a resection of the left distal clavicle and anterior acromioplasty of the left shoulder at St. Joseph Medical Center (R. 17) (Ex. 9F). The postoperative diagnosis was impingement syndrome and osteoarthritis of the acromioclavicular joint in the left shoulder.

In June 1999, after the surgery, Ms. Pera complained of continued left shoulder pain to Dr. Tonino (R. 17) (Ex. 7F). Dr. Tonino's impression was that Ms. Pera suffered from a subacromial spur, which required arthroscopy and decompression. Based on this diagnosis, Ms. Pera underwent arthroscopy on September 8, 1999, which revealed a partial thickness tear of the rotator cuff (R. 17,

159-60, 164) (Ex. 2F, at 7). On September 27, 1999, Dr. Tonino indicated that Ms. Pera's therapy was progressing well (R. 164). About one month later, Dr. Tonino indicated that Ms. Pera could return to work the following day, but that she could only perform work with her right arm (R. 191).

On December 1, 1999, Ms. Pera underwent a work capacity evaluation (R. 202). That evaluation revealed a work tolerance for occasionally lifting forty pounds (floor to knuckle) and frequently lifting up to twenty pounds (floor to knuckle) (R. 202). It also revealed that Ms. Pera could lift ten pounds (waist to overhead) occasionally and five pounds (waist to overhead) frequently (*Id.*). She could also carry thirty pounds occasionally and fifteen pounds frequently, push twenty-seven pounds occasionally and twenty pounds frequently, and pull twenty pounds occasionally and seventeen pounds frequently (*Id.*). Ms. Pera could also perform frequent bending (stooping), frequent climbing, and frequent squatting, and occasional reaching (*Id.*). Ms. Pera could sit, stand, and walk for seven to eight hours at a time, as well as seven to eight hours total during the workday (*Id.*). Finally, the evaluation revealed that Ms. Pera had no restrictions on the use of her right or left hand (*Id.*).

In a visit to Dr. Tonino on February 15, 2000, Ms. Pera reported that her pain had subsided some, but that she still experienced discomfort in her cervical spine (R. 163). Dr. Tonino's examination revealed that Ms. Pera was tender to palpation over the left upper trapezius and along the left paracervical musculature (*Id.*). There was also tenderness to palpation of the left upper trapezius (*Id.*). Dr. Tonino noted that Ms. Pera also had some lateral flexion limitation, but suffered no motor or sensory dysfunction (*Id.*). Her shoulder range of motion was equal bilaterally (*Id.*). Dr. Tonino indicated that Ms. Pera was a candidate for continuing on a home exercise program and that she was capable of working within the restrictions of her functional capacity evaluation, but she

10

could not perform unrestricted work, particularly repetitive activities (*Id.*). Dr. Tonino concluded that Ms. Pera should be seen on an "as needed" basis (*Id.*).

In March 2000, Dr. Tonino released her for work with the restrictions he marked on the functional capacity evaluation (Exs. 2F, at 4; 10F). Dr. Tonino indicated that Ms. Pera had a light to medium residual functional capacity, in spite of her injuries (R. 18; Ex. 10F).

On April 25, 2000, Dr. Gerald Coffman ("Dr. Coffman"), a state agency physician, reviewed Ms. Pera's medical records (R. 170-77). Dr. Coffman noted that after the surgery in September 1999, Ms. Pera had a full range of motion and bilaterally equal strength (R. 177). Dr. Coffman concluded that Ms. Pera was capable of working within the restrictions of the functional capacity found by Dr. Tonino, which limited her to no repetitive activities involving overhead lifting or repetitive lifting of more than 25 pounds (*Id.*).

### C.

On August 10, 2000, the ALJ held an Administrative Hearing (the "hearing") at which Ms. Pera, accompanied by her attorney, testified (R. 39-58), as did a Vocational Expert ("VE") (R. 58-67).

### 1.

Ms. Pera testified that, even with the limitations indicated by the functional capacity exam, she could not work because of her left shoulder and neck pain (R. 48). Ms. Pera indicated that her shoulder hurt constantly and nothing, including medication, seemed to help her (R. 48-49, 52-53). Because medications did not help, Ms. Pera testified that she only occasionally took non-prescription Aleve or Advil for her pain, and she did not use heat or cold therapies because these also had proved to be ineffective (R. 52-53). Ms. Pera said that her right arm also hurts, but she has never seen a

11

doctor about the pain (*Id.*). Ms. Pera also has problems with her neck and had an MRI examination performed in October 1998 (R. 55-56).

Ms. Pera testified that she no longer does much housework. Ms. Pera said that she could dust and fold clothes (R. 49-50), but she relied on help from her husband and daughter to complete her other chores (R. 50). For example, as indicated, her husband helped her with the laundry, and her daughter would visit occasionally to do vacuuming and other cleaning (*Id.*). Ms. Pera was still able to dress herself, but her pain prevented her from doing other simple tasks such as opening a jar or moving a gallon of milk with her left arm (R. 52, 54). Additionally, Ms. Pera claimed that her shoulder injury prevents her from crocheting (R. 52-54). For relaxation, Ms. Pera watches television and does word puzzles (R. 49).

## 2.

Ms. Hoscith, a vocational rehabilitation counselor, testified as the VE at Ms. Pera's hearing (R. 62). The VE began by addressing Ms. Pera's past work experience (*Id.*). According to the VE, Ms. Pera's prior work as a bottle warehouse worker would be classified as heavy, unskilled work. The VE also noted that Ms. Pera described her past work as a receptionist as requiring skills different than those typically performed by receptionists in the general economy (R. 64). Typically, receptionist work is sedentary, semi-skilled work, but Ms. Pera's description of her previous work indicated that she worked in a sedentary *unskilled* position (R. 64-65).

The ALJ asked the VE to answer a hypothetical question based upon Ms. Pera's age, education and vocational background (R. 62). In the hypothetical, the ALJ had the VE assume an individual of Ms. Pera's age, with her education and vocational background (*Id.*) who also had left shoulder pain (described as a left shoulder impairment) and was able to occasionally lift 10 pounds

12

from her waist to above her head; occasionally lift 40 pounds from the floor to her knuckle; occasionally carry 30 pounds with both hands; frequently carry 15 pounds with both hands; occasionally push 27 pounds with both hands; frequently push 20 pounds with both hands; occasionally pull less than 20 pounds with both hands; and frequently pull less than 17 pounds with both hands (R. 63). In addition, the individual could frequently bend, squat, climb, stoop, and reach occasionally (*Id.*). Additionally, the individual could sit, stand, or walk seven to eight hours per day. And, there were no restrictions on the use of either hand (*Id.*).

In response, the VE testified that such an individual could not do work as a bottle warehouse worker (R. 63), but could perform the work of a receptionist described by Ms. Pera as a part of her past work experience (R. 63-67). The VE stated that there are approximately 8,000 receptionist jobs regionally in the receptionist category (R. 64). The VE noted that these jobs are categorized as sedentary, semi-skilled and that the prior receptionist work described by Ms. Pera would be categorized as sedentary and unskilled work (*Id.*).

The VE was then questioned by Ms. Pera's attorney. Ms. Pera's attorney first asked the VE how many unskilled receptionist jobs were available regionally (R. 64). The VE answered that she would estimate 2000 to 3000 such jobs existed regionally (R. 64-65). Ms. Pera's attorney then asked the VE to consider someone whose inability to keep her arm in any one position would force her to use her other arm 99 percent of the time (R. 65). Such a person would have effectively only one functional arm (*Id.*). The VE said that no receptionist jobs would exist for an individual with those limitations (*Id.*).

13

**D.**

The ALJ issued his decision on August 17, 2000 (R. 14-21). The ALJ applied the standard five-step sequential evaluation pursuant to 20 C.F.R. §§ 404.1520. At step one, the ALJ found that Ms. Pera had not engaged in any substantial gainful activity since May 1, 1999 (R. 16). At step two, the ALJ found that Ms. Pera's left shoulder impingement was a severe impairment (R. 16-17). The ALJ noted that Ms. Pera's left shoulder suffered a combination of musculoskeletal impairments, evidenced by her left shoulder impingement, and that these impairments "significantly limited [Ms. Pera's] ability to do physical work-related activities such as heavy or overhead lifting and reaching" (R. 17). However, at step three of the sequential analysis, the ALJ found that the record does not establish that Ms. Pera is subject to any impairment or combination of impairments that meet or medically equal the specifications of an impairment listed in the Agency regulations (*Id.*).

In making this determination at step three, the ALJ looked to the record and found that the medical signs and findings did not support a finding that Ms. Pera's impairments are severe enough to prevent her from doing any gainful activity (R. 18). Specifically, the ALJ relied upon Dr. Tonino's diagnosis of Ms. Pera in March 2000 and the State Agency reviewing physician's April 2000 opinion (R. 17-18). The ALJ noted that Dr. Tonino, a treating physician, released Ms. Pera for work with the restrictions of her functional capacity evaluation in March 2000, six months after her second shoulder surgery (R. 17). In addition, the ALJ also noted the reviewing physician's findings that Ms. Pera's impairments did not meet or equal a Listed impairment and that she retained the RFC for, at best, medium work (R. 18). The ALJ recognized that "[s]ymptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone" (R. 18). However, the ALJ found Ms. Pera "not fully credible" (R. 18). As support for this opinion, he noted

14

that Ms. Pera's "reported daily activities, local, duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; medications and side effects; and other factors concerning functional limitations were not reasonably consistent with the medical and other evidence" (R. 18).

Having concluded that Ms. Pera's impairments were not medically equivalent to any of the Listings, the ALJ moved to step four. At this step, the ALJ determined that Ms. Pera's residual functional capacity (RFC). In so doing, the ALJ determined that "the record does not show underlying medically determinable impairments which could reasonably cause [Ms. Pera's] alleged pain and other symptoms[,]" but that "[Ms. Pera's impairments caused exertional limitations" (R. 19). The ALJ found that Ms. Pera's mental status was uncompromised, but that she suffered all the impairments listed in her work capacity summary, which limited her to light-medium work with only occasional reaching (R. 19)(Ex. 10F). The ALJ then found that these limitations do not prevent Ms. Pera from doing some of her past relevant work (*Id.*). The ALJ found that, consistent with the opinion expressed by the VE based on Ms. Pera's limitations as found by Dr. Tonino, Ms. Pera could not perform her previous work as a warehouse worker, she could return to past "relevant unskilled[,] sedentary work as a receptionist" (*Id.*).

### III.

In order to establish a "disability" under the Act, a claimant must show an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A)(2002). A claimant must demonstrate that her impairments prevent her from performing not only his past work, but also any other work that exists in significant numbers in the national economy. *See* 42 U.S.C. §

15

423(d)(2)(A). The social security regulations prescribe a sequential five-part test for determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520 (2002). Under this rule, the ALJ must consider: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) whether the claimant is unable to perform his past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520; *see also Young v. Sec'y of Health and Human Services,* 957 F.2d 386, 389 (7th Cir. 1992).

A finding of disability requires an affirmative answer at either Step 3 or 5. A negative answer at any step other than Step 3 precludes a finding of disability. *Id.* The claimant bears the burden of proof at Steps 1 through 4, after which the burden of proof shifts to the Commissioner at Step 5. *Id.* In cases of severe impairment, the ALJ's analysis at Step 4 typically involves an evaluation of the claimant's residual functional capacity to perform the past relevant employment. *See* 20 C.F.R. § 404.1520(e). If a person can still do this kind of work, the Commissioner will find that the person is not disabled. *Id.* The Step 5 analysis involves an evaluation of the claimant's residual functional capacity to perform any other work in the national economy (other than the relevant past employment). *See Bowen v. Yuckert,* 482 U.S. 137, 142 (1987); 20 C.F.R. § 1520(f).

In reviewing the Commissioner's (here the ALJ's) decision, this Court may not decide facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *Herron v. Shalala,* 19 F.3d 329, 333 (7th Cir.1994). The Court must accept the findings of fact that are supported by "substantial evidence," 42 U.S.C. § 405(g) (2002), which is defined as "such relevant

16

evidence as a reasonable mind might accept as adequate to support a conclusion." *Herron*, 19 F.3d at 333 (quotations omitted). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner (or the ALJ), not the courts. *See Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). *See also Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir.1989) (the ALJ has the authority to assess medical evidence and give greater weight to that which the ALJ finds more credible). The Court is limited to determining whether the Commissioner's final decision is supported by substantial evidence and based upon proper legal criteria. *Ehrhart v. Sec'y of Health and Human Services*, 969 F.2d 534, 538 (7th Cir. 1992). A finding may be supported by substantial evidence even if a reviewing court might have reached a different conclusion. *See Delgado v. Bowen*, 782 F.2d 79, 83 (7th Cir.1986) (per curium).

Of course, the Commissioner (or ALJ) is not entitled to unlimited judicial deference. The ALJ must consider all relevant evidence and may not select and discuss only that evidence which favors his or her ultimate conclusion. *See Herron*, 19 F.3d at 333. Although the ALJ need not evaluate in writing every piece of evidence in the record, the ALJ's analysis must be articulated at some minimal level and must state the reasons for accepting or rejecting "entire lines of evidence." *Id. See also Young*, 957 F.2d at 393 (ALJ must articulate reason for rejecting evidence "within reasonable limits" if there is to be meaningful appellate review); *Guercio v. Shalala*, No. 93 C 323, 1994 WL 66102, at *9 (N.D. Ill. March 3, 1994) (ALJ need not spell out every step in reasoning, provided the ALJ has given sufficient direction that the full course of the decision may be discerned) (citing *Brown v. Bowen*, 847 F.2d 342, 346 (7th Cir. 1988)). The written decision must provide a "logical bridge from the evidence to [the] conclusion" that allows the reviewing court a "glimpse into the reasoning behind [the] decision to deny benefits." *See, e.g., Zurawski v. Halter*, 245 F.3d 881,

887, 889 (7th Cir. 2001) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)). This is especially true regarding credibility determinations, since both the case law and the regulations require an ALJ to minimally articulate the specific reasons for the credibility finding. *Zurawski*, 245 F.3d at 887. Specific reasons are required so that the reviewing Court can ultimately assess whether the ALJ's determination was supported by substantial evidence or, if not, was "patently wrong." *Id.* (quoting *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000)).

Ms. Pera challenges the ALJ's findings at Steps 3, 4 and 5 of the sequential analysis. We begin or analysis with Step 3.

## IV.

As indicated above, a Step 3 finding requires the ALJ to determine whether the claimant's limitations (which were found severe at step two) meet or equal a listed disability found within 20 C.F.R. Part 404, Appendix 1, Subpt. P. At this step, the burden of proof rests with the plaintiff who must show that her impairments meet or equal any impairment listed in the regulations as being so severe as to preclude substantial gainful activity. *See Young v. Secretary of Health and Human Services*, 957 F.2d at 389.

Ms. Pera challenges the ALJ's findings on several grounds. *First*, Ms. Pera contends that the ALJ, despite corroborating medical evidence, ignored her testimony including left arm pain and limitation (Pl.'s Mem. at 8). *Second*, Ms. Pera contends that the ALJ ignored uncontroverted evidence of her subjective complaints of pain and limitations in her right arm (Pl.'s Mem. at 9). *Third*, Ms. Pera argues that new evidence submitted after her ALJ hearing should be considered when assessing whether the ALJ's decision is supported by substantial evidence (Pl.'s Reply at 4-5). We will begin by addressing Ms. Pera's final argument, that new evidence submitted after an

administrative hearing should be taken into account when determining whether findings are supported by substantial evidence; then, we will address each of her remaining Step 3 arguments, in turn.

**A.**

Ms. Pera contends that this Court should consider new evidence submitted after the administrative hearing when determining whether the ALJ's findings are supported by substantial evidence. Specifically, Ms. Pera alleges that a short note from Dr. Tonino (R. 208) indicating that she was limited to lifting less than five pounds overhead, and should avoid repetitive tasks with either arm supports her subjective complaints of pain and limitation in both arms, and must be taken into account when determining whether the ALJ's decision at Step 3 is supported by substantial evidence.

The relevant regulation for Ms. Pera's argument is 20 C.F.R. § 404.970(b). This regulation provides:

> If new and material evidence is submitted, the Appeals Council shall consider additional evidence only where it relates to the period on or before the date of the administrative law judge hearing. The Appeals Council shall evaluate the entire record, including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.

The Court's review of whether the Appeals Council made an error of law in applying this regulation is *de novo. See Eads v. Sec'y of Health and Human Services,* 983 F.2d 815, 817 (7th Cir. 1993). Unless there is an error of law, the Council's decision whether to review is discretionary and unreviewable. *See Damato v. Sullivan,* 945 F.2d 982, 988 (7th Cir. 1992). Where the Council's

decision is unreviewable, the ALJ's decision is the final decision reviewed under 20 C.F.R. § 405(g). *See also Perkins v. Chater*, 107 F.3d 1290, 1294 (7th Cir. 1997).

To the extent that Ms. Pera argues that the Council erred in its application of Section 404.970(b), that argument is without merit. The Council considered the new evidence submitted by Ms. Pera: a short note from Dr. Tonino dated September 20, 2000, which was after the evidentiary hearing held on August 10, 2000 and after the ALJ's written decision of August 17, 2000. The Council observed that "a portion of the [new] medical evidence is a duplicate of evidence in Exhibits 7F and 10F" (R. 7) (*compare* Exs. 7F and 10F *and* AC-2). And, we note, to the extent it added new restrictions, the note did so without offering any accompanying explanation. Upon its review, the Council concluded "that neither the contentions [of Ms. Pera concerning the evidence presented to the ALJ] nor the additional evidence provides a basis for changing the [ALJ's] decision" (R. 7-8). Since the Council considered the new evidence presented by Ms. Pera, and we find no error of law in the way that it did so, this Court will not review the Council's discretionary decision denying review of the ALJ's decision. *Perkins*, 107 F.3d at 1294.

Equally unavailing is Ms. Pera's argument that this Court should assess the ALJ's determination in light of the new evidence that never was presented to the ALJ. Although Ms. Pera argues that decisions from other courts of appeals "support the notion that the substantial evidence review . . . [should not be] limited to the record before the ALJ[,]" (Pl.'s Reply at 4-5), the Seventh Circuit's decision in *Eads* squarely forecloses that argument. In *Eads*, the Seventh Circuit explained that when the Appeals Council has refused to review the case, "the decision reviewed in the courts is the decision of the administrative law judge . . . . The correctness of that decision depends on the evidence that was before him. . . He cannot be faulted for having failed to weigh evidence never

presented to him . . . ." 983 F.2d at 817. The appeals court further stated that evaluating the ALJ's decision based on evidence never presented to him improperly "would change our role from that of a reviewing court to that of an administrative law judge, required to sift and weigh evidence in the first instance, rather than limited as we are to reviewing evidentiary determinations made by the front-line factfinder." *Id.* at 817-18. In so holding, the Seventh Circuit considered and rejected contrary conclusions reached by two other circuits. *Id.* at 818. Accordingly, this Court declines Ms. Pera's invitation to ignore clearly controlling Seventh Circuit precedent.[1]

## B.

This Court, is required to test whether an ALJ's analysis at least "minimally" discussed and considered the issue of disability, including evidence that ultimately contradicts the Commissioner's final conclusion. *See Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001); *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2001); *Green v. Shalala*, 204 F.3d 780, 781 (7th Cir. 2000). As many cases now hold, this analysis must build an "accurate and logical bridge from the evidence to the conclusion." *Clifford*, 227 F.3d at 872.

Ms. Pera contends that the ALJ's Step 3 analysis failed to satisfy these standards. The Court disagrees.

## 1.

Ms. Pera contends that the ALJ ignored her subjective claims of pain and left arm limitation despite the fact that they were supported by Dr. Tonino's diagnosis. Specifically, Ms. Pera claims that the ALJ ignored her subjective testimony concerning her pain and limitations in her left arm,

---

[1] The *Eads* court noted that the plaintiff there could have requested a remand so that the administrative law judge could consider the new evidence, but failed to do so. 983 F.2d at 817. Likewise, Ms. Pera here has not sought a remand.

21

even though they were corroborated by Dr. Tonino's records. In his opinion, the ALJ wrote, "[t]he record does not show underlying medically determinable impairments, which could reasonably cause [Ms. Pera's] alleged pain and other symptoms" (R. 19). Because he did not find Ms. Pera "fully credible," the ALJ discounted her subjective complaints of pain (R. 18).

Ms. Pera's argument that the ALJ ignored her subjective claims of pain and limitation in her left arm relies, in part, on the examination conducted by Dr. Tonino after Ms. Pera's ALJ hearing. However, as we discussed above, this evidence is not reviewable. Since evidence submitted after the administrative hearing is not reviewable, we must decide whether, absent the new evidence, the ALJ's finding about the credibility of Ms. Pera's subjective claims is supported by substantial evidence.

The ALJ found Ms. Pera "not fully credible" because her complaints about her restrictions were "not reasonably consistent with the medical or other evidence" (R. 18). Had the ALJ rested his determination of Ms. Pera's credibility only on this statement, the Court would remand for clarification of the ALJ's reasoning. *See generally Zurawski*, 245 F.3d at 887 (lower court's decision to deny benefits remanded in order for ALJ to explain why the ALJ concluded claimant's testimony was "inconsistent"). However, here the ALJ sufficiently – albeit succinctly – explained his credibility determination.

The ALJ explained that Ms. Pera's "reported daily activities; the location, duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; medications; and side effects and other factors concerning functional limitations were not reasonably consistent with the medical . . . evidence" (R. 18). The daily activities Ms. Pera reported included limitations such as being only able to dust or fold clothes, being unable to open a jar with her left arm, and being

22

unable to lift a gallon of milk with her left arm. These limitations are contradicted by the functional capacity test performed on December 1, 1999 (R. 202)(Ex. 10F). Ms. Pera demonstrated an ability to do light to medium work, including occasionally lifting 10 pounds from waist to overhead and frequently lifting five pounds from waist to overhead (*Id.*). In addition, the functional capacity test indicated that Ms. Pera was capable of occasional reaching and had no restrictions on the use of either hand (*Id.*). Additionally, Ms. Pera's treating physician found that Ms. Pera had a "full range of motion" and that her "strength is equal bilaterally" (R. 161) (Ex. 2F).

Ms. Pera also testified that her left arm hurt all the time, even when it was resting at her side, and that medication did not help the pain (R. 55-56). These statements are inconsistent with Ms. Pera's statements to Dr. Tonino on March 9, 2000. At this examination, Ms. Pera stated that she was feeling better, and Dr. Tonino indicated that Ms. Pera was a good candidate for home therapy and should continue to see him on an "as needed basis" (R. 161). Accordingly, he released Ms. Pera to work within the limitations of her residual functional capacity exam (*Id.*).

The ALJ also wrote that he "carefully scrutinized the record for a treating physician's opinion, including hard to find evidence . . . [such as] a check mark on a form indicating that the claimant was disabled[,]" but found no evidence that a physician had indicated that Ms. Pera "was unable to work for 12 continuous months" (R. 18). Thus, although Ms. Pera's subjective complaints indicate that she cannot work, the ALJ found nothing in the medical record supporting her complaint. These medical records are substantial and detail Ms. Pera's lengthy patient-doctor relationship with Dr. Tonino, examinations by Dr. Bertolini, and examination of the medical records by a reviewing physician. Despite this wealth of medical evidence, nothing in the record supports a finding that Ms. Pera's pain and limitation is as severe as she claims. In fact, on March 9, 2000, her last medical

examination before the administrative hearing in June 2000, Ms. Pera's treating physician, Dr. Tonino, released her to work within her RFC restrictions (R. 161). In addition, he noted that at the time of the visit, although Ms. Pera had not been able to work, "her shoulder has actually been feeling better" (*Id.*). And, Dr. Tonino's work capacity assessment of Ms. Pera were then affirmed by a reviewing physician in a residual functional capacity exam, completed on April 25, 2000 (R. 170-77) (Ex. 3F).

Unless patently wrong, an ALJ's credibility determination will not be overturned. *Zurawski,* 245 F.3d at 887. "It is not patently wrong for an ALJ to cite inconsistent testimony between the degree of pain that the claimant reports and that suggested by the medical evidence in his credibility determination." *Powers v. Apfel,* 207 F.3d 431, 435-436 (7th Cir. 2000). *See also Knight v. Chater,* 55 F.3d 309, 314 (7th Cir. 1995)("[a]n ALJ may discount subjective complaints of pain that are inconsistent with the evidence as a whole"). As the evidence noted above indicates, there is an inconsistency between the amount of pain and the type of pain that Ms. Pera claims and the medical evidence. Thus, the ALJ's finding on the credibility of Ms. Pera's limitations is not patently wrong. For this reason, we find that the ALJ's credibility findings regarding Ms. Pera's subjective claims of pain and left arm limitations are supported by substantial evidence.

## 2.

Ms. Pera also contends that the ALJ impermissibly ignored her subjective claims of pain her right arm. This argument, like the argument discussed above, rests on both the examination conducted after the hearing and on the ALJ's determination about Ms. Pera's credibility. The evidence submitted after the administrative hearing is not reviewable for the reasons discussed above. However, even if the evidence were reviewed, it offers scant support for Ms. Pera's claims

24

of right arm limitation. There is no other evidence in the record supporting this claim. Ms. Pera never sought treatment for right arm pain and nothing in the substantial medical record corroborates a finding that Ms. Pera suffers pain or limitations in her right arm.[2]

Ms. Pera argues that because her subjective claims are uncontroverted, the ALJ must accept them. This argument, however, misrepresents the nature of the burden of proof. Here, Ms. Pera offered no evidence other than her testimony that she suffers right arm pain and limitation. As we noted earlier, the ALJ found Ms. Pera's testimony "not fully credible" (R. 18), and instead based his finding largely on the objective medical evidence in the record. Ms. Pera never sought treatment for her right arm, or even indicated it was a concern, despite the length and frequency of the treatments for her left shoulder. Because nothing in the medical record supports Ms. Pera's claims of right arm pain and right arm limitations, she did not meet her burden of proof. Accordingly, the ALJ's findings about Ms. Pera's credibility are not patently wrong and will not be reversed.

## V.

We now turn to the ALJ's Step 4 determination. The ALJ found at Step 4 that Ms. Pera could perform her past relevant work as a receptionist. The ALJ based this conclusion on testimony elicited from the vocational expert at the administrative hearing on the relevant regulations (*e.g.*, 20 C.F.R. § 404.1520(c) and § 404.1565). The ALJ stated in his opinion that, based on his hypothetical regarding Ms. Pera, the VE "testified that such a person could return to past relevant unskilled sedentary work as a receptionist" (R. 19; 63-65) and that the number of unskilled sedentary receptionist jobs – although fewer than the semi-skilled variety – would be approximately 2,000-

---

[2]We note that the reviewing physician's RFC assessment indicates that Ms. Pera "alleges disability due to *right* shoulder pain" (emphasis added) (R. 170)(Ex. 13F). This seems to be simply a misstatement on the reviewing physician's part, since his notes relate to Ms. Pera's left shoulder surgery and left arm restrictions.

25

3,000 in this region (R. 64-65).[3] The Court finds that the VE's testimony is a sufficient basis upon which the ALJ could base his determination that Ms. Pera could perform her past relevant work at Step 4.

A conclusion at Step 4 that the claimant can perform her past relevant work and that such work exists in substantial numbers in the regional economy ends the disability inquiry. *Young v. Sec'y of Health and Human Services*, 957 F.2d 386, 389 (7th Cir. 1992) (an answer at Step 4 that indicates that the claimant is able to perform her past relevant work precludes a finding of disability). Ms. Pera, however, seeks to create a Step 5 issue by arguing that substantial evidence does not support the ALJ's Step 4 finding, and that there is not substantial evidence in the record to support a finding a Step 5 that Ms. Pera has the RFC to preform *any* work in the regional economy (R. 10-11). Ms. Pera also argues that the social security rules "mandate" a finding of disability if the "[c]laimant is of advanced age, . . . no longer can perform past relevant work and has limitations . . . regarding [a] functional restriction to light work" such as the inability to engage in repetitive motion with either arm (Pl.'s Mem. at 11) (citing 20 C.F.R. Pt. 404, Subpt. P § 202.00C ("SSR 202.00C"). According to Ms. Pera, SSR 202.00C "states that disability is warranted when the *range* of either light or sedentary work is reduced due to limitations of movement concerning the upper extremities" (R. 11).

But, Ms. Pera's contention that she has limitations on repetitive motion with either arm is not supported by the medical evidence. All of her medical consultations and treatment focused on her *left* arm problem. As stated above, there is no medical evidence – other than the unexplained

---

[3] A "substantial number" of jobs has been interpreted by courts within this Circuit as numbers far less than the 2-3,000 jobs cited by the VE in this case. *See, e.g., Hawkins v. Barnhart*, No. 02 C 2097, 2003 WL 1717076, * 9 (N.D. Ill 2003).

post-decision note (R. 208) that was not before the ALJ and that we do not consider here – of any right arm pain or limitations. The Court finds that the ALJ's Step 4 finding, which was based on testimony by the VE that expressly took into account the functional restrictions found by Dr. Tonino and affirmed by Dr. Coffman, ends the disability analysis. Therefore, Ms. Pera's Step 5 arguments need not (nor should they) be addressed by the Court.

Accordingly, this Court finds that Ms. Pera is not disabled because the substantial evidence supports the ALJ's determination at Step 4 that she can perform her past relevant work as a receptionist at the unskilled, sedentary level, and that a substantial number of these jobs exist in the national economy.

## CONCLUSION

For the reasons set forth above, the Court grants the Commissioner's motion for summary judgment (doc. #17), and denies Ms. Pera's motion for summary judgment (doc. #15). The Clerk of the Court is directed to enter a final judgment pursuant to Rule 58. This case is terminated.

ENTER:

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

Dated: June 19, 2003

27